UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

HENRY C. BEAUPIN,
    *Plaintiff,*

v.

BOSTON UNIVERSITY,
    *Defendant.*

No. 24-cv-12481-BEM

### REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO DISMISS

LEVENSON, U.S.M.J.

Pro se Plaintiff Henry C. Beaupin alleges that his former employer, Defendant Boston University, terminated his employment after he reported discrimination by his supervisor, in violation of the anti-retaliation provisions of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* Defendant has moved to dismiss Beaupin's claims, arguing that Beaupin failed to exhaust his administrative remedies. Defendant advances two separate arguments on this point. First, Defendant contends that the charge Beaupin filed with the Massachusetts Commission Against Discrimination ("MCAD") and the Equal Employment Opportunity Commission ("EEOC") was untimely. Second, Defendant contends that the claims that were alleged in the MCAD charge involved a different incident and did not encompass the facts upon which Beaupin rests his allegations in the present lawsuit.

As discussed below, both of Defendant's central contentions have merit: (1) Beaupin did not file the administrative charge within the statutory time limit for a Title VII claim; and (2) the administrative charge that Beaupin filed concerned materially different facts and allegations from

the claims he advances in this present case. Accordingly, I recommend that the Court grant Defendant's motion to dismiss.

## I. Background

### A. Facts

For purposes of considering a motion to dismiss, the Court must accept all well-pleaded factual allegations as true and must draw all reasonable inferences in the plaintiff's favor.[1] *Langadinos v. Am. Airlines, Inc.*, 199 F.3d 68, 69 (1st Cir. 2000). The facts set forth below are gleaned from Beaupin's original complaint (Docket No. 1), first amended complaint (Docket No. 10), and second amended complaint (Docket No. 16), as well from the relevant documents regarding the administrative proceedings that were attached to Defendant's motion to dismiss (Docket Nos. 20-1, 20-2, 20-3).[2] It is commonly said that a superseding pleading effectively replaces the original. *See Connectu LLC v. Zuckerberg*, 522 F.3d 82, 91 (1st Cir. 2008) ("An amended complaint, once filed, normally supersedes the antecedent complaint. Thereafter, the earlier complaint is a dead letter and no longer performs any function in the case." (internal

---

[1] Although a court must accept as true all *factual* allegations contained in a complaint, the same is not true for conclusory legal characterizations. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[2] Defendant attached to its Memorandum in Support of its Motion to Dismiss the EEOC's Determination and Notice of Rights dated July 2, 2024 (Docket No. 20-1); the charge Beaupin filed with MCAD and the EEOC (Docket No. 20-2); and MCAD's Dismissal and Investigative Disposition (Docket No. 20-3). Beaupin confirmed during oral argument that the document located at Docket No. 20-2 is, in fact, the charge that Beaupin filed with MCAD and the EEOC.

As Defendant correctly argues (*see* Docket No. 20, at 4 n.3), the Court may consider these documents in connection with Defendant's motion to dismiss. *See Gamst v. Boston Univ.*, No. 23-12452-FDS, 2024 WL 758173, at *1 n.1 (D. Mass. Feb. 23, 2024) (explaining that "MCAD and EEOC documents are official public records subject to judicial notice, and therefore may be considered" by the court at the motion to dismiss stage); *Rodriguez v. Putnam Invs.*, No. 06-10819-MLW, 2007 WL 9798216, at *2 (D. Mass. Sept. 15, 2007) ("Even though [the plaintiff] did not attach to her filing the [MCAD] or [EEOC] Dismissal and Notice of Rights . . . , both documents are matters of public record, and central to the [plaintiff's] claims and [the defendant's] assertion that they are time-barred. Therefore, they may be considered in deciding the motion to dismiss.").

quotation marks and citations omitted)). On the basis of Beaupin's submissions, however, it does not appear that he has intentionally abandoned the allegations in his original complaint. Given that Beaupin is proceeding *pro se*, I have considered all three complaints in order to afford Beaupin the most generous possible understanding of the facts.[3]

### 1. *Beaupin's Employment as a Public Safety Officer*

Beaupin worked for Defendant as a Public Safety Officer until his termination in 2017.[4] Docket No. 20-2, at 1. As a Public Safety Officer, Beaupin was responsible for "ensuring compliance with medical center policies, dispatching employees to maintenance and emergency calls, and training new employees using a curriculum he co-developed." Docket No. 16, at 1.

Beaupin is Black and of Haitian origin. Docket No. 20-2, at 1. He speaks Haitian Creole and did so at work on occasion. Docket No. 20-3, at 2.

### 2. *The May 2017 Incident: The Hugs Policy*

Beaupin alleges in his second amended complaint that, in May 2017, he was stationed at the security dispatch desk when "a critical incident occurred in the NICU." Docket No. 16, at 2. According to Beaupin, "[a] father exited the unit with a baby," but for some reason "the Hugs

---

[3] I refer in this report to Beaupin's "first amended complaint" and "second amended complaint." The labelling in the Court's docket, however, reflects the captions under which these were filed. Thus, the first amended complaint is listed in the docket as "Motion to Amend Complaint in Order to Add EEOC Right to Sue Notice" (Docket No. 10). In turn, the second amended complaint appears as "Leave of the Court to Amended Complaint Add Detailed Timeline of Events" (Docket No. 16).

[4] According to Beaupin, he began his employment as a Public Safety Officer on October 3, 2003. Docket No. 16, at 1. Albeit immaterial to the issues presently before the Court, I note that other documents suggest that Beaupin did not start working for Defendant until September or October 2008. *See* Docket No. 20-3, at 2 ("Around September 2008, [Defendant] hired [Beaupin] as a Public Safety Officer who worked at Boston University Medical Center."); *id.* at 3 ("In October 2008, [Defendant] hired [Beaupin] as a Public Safety Officer ("PSO") at the Boston University's Medical Campus ("BMC").").

3

alarm system[5] did not activate until [the father] reached a downstairs exit." *Id*. Accordingly, "[t]he security team only became aware of the situation when a nurse reported it via phone." *Id*. Beaupin explains that the nurse's call "triggered an urgent response to locate the parent and baby," who were "ultimately return[ed] . . . safely to the unit." *Id*. Beaupin asserts that he "provided step-by-step guidance to officers during the . . . incident." *Id*.

The following day, Beaupin's supervisor, Joseph Khirullah, called a meeting at which "the procedures surrounding the Hugs alarm system were discussed." *Id.* Beaupin claims that the meeting made clear that, although Beaupin was "familiar with the policy as part of [his] role in dispatch, . . . many of [his] colleagues were not." *Id*. Indeed, according to Beaupin, "[s]everal officers, all white males and females, openly stated that they were unaware of the Hugs policy." *Id*. Beaupin "remain[ed] silent during th[e] discussion." *Id.*

Later that day, a manager, whom Beaupin identifies as "Director Gibbons," called Beaupin into his office. *Id.* According to Beaupin, Director Gibbons was "visibly upset." *Id.* Beaupin contends that Director Gibbons' tone was "hostile" and that he made "demeaning remarks," including "interrogating [him] about [his] knowledge of the Hugs policy" and "accusing [him] of incompetence despite [his] experience." *Id*. According to Beaupin, he attempted to clarify that he was "well-versed in the policy due to [his] work in dispatch," but Director Gibbons continued to "berat[e]" him. *Id*. Beaupin asserts that Director Gibbons "continued to verbally attack [Beaupin],

---

[5] The parties do not explain the "Hugs alarm system" or its attendant policy. Although not essential to this Report and Recommendation, I note that a brief internet search suggests that "Hugs is an infant protection system for hospitals" created by TPC Systems. *Hugs Infant Protection*, TPC SYSTEMS, 2, https://tpcsystems.com/wp-content/uploads/2021/12/Hugs-Infant-Security.pdf. The system works by sounding an alarm when a baby has been removed from the "safe area," when the "Hugs tag" applied to the baby has been tampered with, or when the "Hugs tag" has not "check[ed]-in" for a specific amount of time. *Id.*

4

calling [him] 'useless' and pounding his fist on the desk." *Id.* Beaupin claims that he left Director Gibbons' office feeling "humiliated and deeply disrespected." *Id.*

Beaupin further alleges that, after returning to his post, he noticed Supervisor Khirullah glaring at him, which left him feeling unsettled, so he left work four hours early. *Id*. While driving home, Beaupin received calls from colleagues, who reported that although Director Gibbons had reprimanded Supervisor Khirullah later that day, Supervisor Khirullah had "deflected blame onto [Beaupin] by falsely claiming that [Beaupin] did not know the Hugs policy." *Id*.

The next day, Beaupin alleges, he reviewed "the previous day's roll call attendance" and noticed that "all officers who had voiced concerns about the Hugs policy were white." *Id.* at 2–3. In light of this discovery, Beaupin approached Director Gibbons to address his "concerns." *Id.* at 3. Specifically, Beaupin expressed to Director Gibbons that he "was being harassed, discriminated against, and unfairly targeted by Supervisor Khirullah" and asked "why [he] was treated more harshly than [his] white colleagues." *Id*. At this point, Director Gibbons asked Supervisor Khirullah to join the meeting. *Id.* With Supervisor Khirullah in the room, Beaupin "reiterated [his] concerns," "highlighted how [he] was scapegoated and unfairly targeted," and stated his "intention to file a discrimination complaint." *Id.* Beaupin was informed that he would "hear back soon." *Id.*

### 3. The June 2017 Incident: The Unwanted Visitor

In his second amended complaint, Beaupin alleges that, on June 19, 2017, Beaupin received permission from his supervisor to allow someone to visit a patient in the hospital.[6] *Id*. An hour into the visit, the visitor and the patient apparently "got into an argument," but by the time security arrived at the patient's room, "the visitor had already left the premises." *Id*.

---

[6] Beaupin does not specify who purportedly gave him permission to admit the visitor.

5

MCAD's Investigative Disposition (Docket No. 20-3) provides additional detail about the June 2017 incident from both Beaupin and Defendant's perspectives.

According to the "Complainant's Allegations" section of MCAD's Investigative Disposition, on June 19, 2017, a visitor came to the hospital and asked to visit a patient who was on "protected status." Docket No. 20-3, at 2. Beaupin contacted his supervisor, Justyna Wells, to discuss admitting the visitor. *Id.* After talking to Supervisor Wells, Beaupin allowed the visitor to see the patient. *Id.* When the visitor entered the room, the visitor and the patient argued, and the patient apparently stated: "I don't want her up here." *Id.* The visitor was subsequently removed from the room, and Beaupin was investigated for violation of the "protected patient policy." *Id.*

As the "Respondent's Position" section of MCAD's Investigative Disposition makes clear, Defendant had a drastically different account of the incident.[7] According to Defendant, Beaupin was working at the information desk on June 19, 2017, when a visitor approached him and requested admission to a patient's room. *Id.* at 3. The visitor was not on the patient's list of approved visitors, but the visitor showed Beaupin a series of text messages with the patient in an effort to show that she and the patient were in contact. *Id*. Beaupin called Public Safety Officer Greg LeBlanc to ask whether the visitor should be added to the patient's visitor list. *Id*. Officer LeBlanc told Beaupin that the patient had not updated her list to include the visitor and, therefore, the visitor should not be admitted. *Id*. Beaupin then contacted Supervisor Khirullah to confirm whether the patient's visitor list was, in fact, up to date. *Id*. Supervisor Khirullah confirmed that it was, and advised Beaupin to "send a patrol officer to the room to collect a new list if the patient want[ed] to add a name." *Id*. Beaupin apparently did not do so. Rather, he called the patient's room

---

[7] Defendant's account is apparently based on an investigation that included conversations with social workers, nurses, and Beaupin. *See* Docket No. 20-3, at 4.

to ask whether the patient wanted to see the visitor. *Id.* When the patient did not pick up the phone, the visitor showed Beaupin texts, and even allowed him to listen to a phone call (purportedly from the patient), to indicate that the visitor was welcome. *Id*. Beaupin ultimately admitted the visitor.[8] *Id.* After a verbal altercation between the patient and the visitor,[9] the visitor was asked to leave, and a staff member notified the Public Safety Department that the patient had an unwanted visitor in her room. *Id.* at 4. Beaupin asked the patient not to tell anyone about the incident so that he would not get in trouble. *Id*. Beaupin apparently asked this in Haitian Creole, even though the patient also spoke English. *Id*. Following an investigation, Defendant concluded that Beaupin had violated protocol by permitting a visitor to visit a patient without speaking to the patient in person and that he had attempted to cover up his conduct. *Id*.

    4.    *Beaupin's Termination and His Challenges to that Termination*

On or around June 20, 2017, Beaupin was informed that he "was under investigation in relation to the [June] incident" and within a month he was terminated. Docket No. 16, at 3. According to MCAD's Investigative Disposition, Beaupin's termination occurred on July 17, 2017. Docket No. 20-3, at 4. Beaupin contends that, up to that time, he had "consistently received positive job performance evaluations." Docket No. 1, at 6; *see also* Docket No. 16, at 3–4 (providing Beaupin's 2016/2017 positive performance evaluation).

---

[8] Defendant's contention in MCAD's Investigative Disposition was that *after* admitting the visitor, Beaupin contacted Supervisor Wells to get the visitor added to the patient's list. Docket No. 20-3, at 3. Beaupin told Supervisor Wells that the visitor was missing from the patient's approved visitor list and asked that she be added. *Id*.

[9] When the visitor entered the room, the patient was apparently asleep. Docket No. 20-3, at 3. When the patient awoke, the visitor shared a message from the patient's boyfriend (who was the visitor's cousin) that he "wanted the patient and their unborn baby to die." *Id.* at 3–4.

7

Following Beaupin's termination, he initiated a grievance with his union, the International Brotherhood of Police Officers. Docket No. 20-3, at 2. Beaupin's union grievance proceeded to arbitration, and on July 25, 2019, the arbitrator found that Defendant "had just cause for terminating [Beaupin's] employment." *Id.*

More than seven months after the arbitration decision, on March 2, 2020, Beaupin filed a charge with MCAD and the EEOC, claiming that Defendant had discriminated against him on the basis of race and national origin, thereby violating Mass. Gen. Laws Chapter 151(B) and Title VII. *See generally* Docket No. 20-2. In the charge, Beaupin offered a summary account of the June 2017 incident, claimed that he had not actually violated the protected patient policy, and contended that his termination was "unjust." *Id.* at 1. Beaupin also asserted in the charge that, although he originally "did not suspect any discriminatory animus," after reading over the arbitration-related documents, he began to feel as through "discriminatory animus had been involved in [his] termination." *Id.* Specifically, Beaupin pointed to certain nurses' statements to the effect that he "had been speaking Haitian Creole with the visitor and had been conniving with her to get her into the patient's room." *Id.* Beaupin contended that this circumstance demonstrated that he had been "terminated because [he is] Black and of Haitian ancestry." *Id.*

On May 22, 2024—roughly four years after Beaupin filed the charge and nearly seven years after the underlying events—MCAD completed its review. *See* Docket No. 20-3. MCAD's analysis began by concluding that it had jurisdiction over the charge. *See id.* at 4–5. MCAD acknowledged that the charge would typically be considered untimely under its governing regulation, which provides that a charge must be filed within 300 days of the conduct at issue. *See id.* at 4 (explaining that for the charge to be considered timely, the conduct at issue would need to have occurred on or after May 7, 2019). MCAD noted, however, that under the regulation that had

8

governed at the time of Beaupin's termination, in 2017, the charge would have been considered timely, since it was filed within 300 days of the arbitrator's July 25, 2019, decision. *See id.* (noting that if the complainant entered into a grievance proceeding, the operative 2017 regulation looked to the "outcome" of that proceeding, rather than the underlying incident, as the triggering event for the filing deadline). Due, at least in part, to Beaupin's pro se status, MCAD decided to treat his charge as timely, in order to avoid dismissing his claims based on what MCAD deemed a sudden "change to a technical rule." *Id.* at 4–5.

On the merits, MCAD determined that there was "insufficient evidence upon which a fact finder could form a reasonable belief that it is more probable than not that [Defendant] committed an unlawful practice in violation of [Chapter] 151B."[10] *Id*. at 6. On this basis, MCAD rendered a "Lack of Probable Cause finding." *Id*.

On July 2, 2024, Beaupin received an email from the EEOC, notifying him that the EEOC would "not proceed further with its investigation" and that it had "adopted the findings of the state or local fair employment practices agency that investigated [his] charge." *See* Docket No. 20-1, at 1–2. The email also included language notifying Beaupin of his right to sue. *Id.* at 2.

### B.     *Procedural Posture*

On September 27, 2024, Beaupin filed suit in the U.S. District Court for the District of Massachusetts, naming Boston University as a defendant. Docket No. 1. Beaupin's original

---

[10] MCAD concluded that Defendant "assert[ed] and support[ed] with evidence a non-discriminatory reason for [Beaupin's] termination—specifically, that [Beaupin] violated the Patient Identification Protection Policy and [Defendant's] Code of Conduct Policy on June 19, 2017." Docket No. 20-3, at 5. Although Beaupin argued that the stated reason for his termination was pretextual, MCAD disagreed, noting that Defendant "terminated three employees outside of [Beaupin's] protected classes for ancestry and two employees outside of [Beaupin's] protected class for race in 2016 and 2017 for violations of standards of conduct or unsatisfactory performance." *Id.* at 6. MCAD also noted that Defendant "hired two employees in [Beaupin's] protected class of race after terminating [his] employment." *Id.*

9

complaint summarized the May 2017 incident discussed above (albeit at a high level). *See* Docket No. 1, at 6. Beaupin alleged that Defendant violated Title VII[11] when it terminated his employment, contending that the termination was intended as retaliation for raising discrimination-related concerns to Director Gibbons. *See id.* at 3, 6. Beaupin sought "compensation for [seven years of] lost wages . . . , along with punitive damages and compensation for emotional distress," totaling one million dollars. *Id.* at 4. The complaint did not address whether Beaupin had filed a charge with MCAD or the EEOC. *See id.*

On October 17, 2024, Beaupin filed his first motion to amend the complaint, in which he sought to add a copy of the Right to Sue Notice that he had received from the EEOC. *See* Docket No. 10, at 1. Although the Court granted Beaupin's motion (Docket No. 14), Beaupin never amended the complaint. Instead, on December 18, 2024, Beaupin filed a second motion to amend. *See* Docket No. 16; *see also* Docket No. 25 (Defendant's opposition). With this second motion, Beaupin sought leave to "add [a] detailed timeline of events." Docket No. 16, at 1. The second motion to amend included additional detail regarding the May 2017 incident, as well as a high-level summary of the June 2017 incident. *See id.* at 2–3.

On December 20, 2024, Defendant filed a motion to dismiss, which Beaupin opposed. *See* Docket Nos. 19 (Defendant's motion to dismiss), 23 (Beaupin's opposition); *see also* Docket No. 24 (Defendant's reply). In its motion to dismiss, Defendant argued that Beaupin's claims were subject to dismissal for failure to exhaust administrative remedies. *See* Docket No. 20.

I held oral argument on Beaupin's second motion to amend and Defendant's motion to dismiss on February 20, 2025. *See* Docket No. 30. During the oral argument, I granted Beaupin's

---

[11] Beaupin's complaint inadvertently alleged that Defendant violated Title VI of the Civil Rights Act of 1964. *See* Docket Nos. 1, at 3. Beaupin confirmed during oral argument that he intended to allege a violation of Title VII.

motion to amend. *Id.* I acknowledged Defendant's argument that allowing Beaupin to amend the complaint for a second time would be futile, but I permitted the amendment [12] based on Beaupin's pro se status (and following Defendant's confirmation that its arguments for dismissal would remain the same if the Court allowed Beaupin's motion to amend, such that a new motion to dismiss would not be necessary). I then heard from the parties regarding their respective positions on dismissal and took Defendant's motion to dismiss under advisement.[13]

The parties informed the Court on February 21, 2025, that they did not consent to magistrate judge jurisdiction. *See* Docket No. 31. As such, the case was reassigned to District Judge Brian E. Murphy, who subsequently referred Defendant's motion to dismiss to me for report and recommendation. *See* Docket No. 33.

---

[12] The Federal Rules of Civil Procedure "take a liberal stance toward the amendment of pleadings, consistent with the federal courts' longstanding policy favoring the resolution of disputes on the merits." *Amyndas Pharms., S.A. v. Zealand Pharma A/S*, 48 F.4th 18, 36 (1st Cir. 2022). Specifically, Rule 15 provides that a plaintiff may amend his complaint once as a matter of course, so long as it is done within a certain amount of time, and thereafter only with leave of the court. Fed. R. Civ. P. 15(a). Rule 15 counsels that, when leave of court is required, it should be "freely give[n] . . . when justice so requires" Fed. R. Civ. P. 15(a)(2). "The limited reasons for denying a pre-judgment motion to amend include 'undue delay, bad faith, futility and the absence of due diligence on the movant's part.'" *Torres-Alamo v. Puerto Rico*, 502 F.3d 20, 25 (1st Cir. 2007) (quoting *Palmer v. Champion Mtg.*, 465 F.3d 24, 30 (1st Cir. 2006)).

[13] During oral argument, Beaupin—who is proceeding pro se—argued on his own behalf. Attorney Belli, who works at Defendant's Office of the General Counsel, argued on behalf of Defendant. Both Beaupin and Attorney Belli were personally involved in the events at issue in this claim, and portions of the argument sounded more like testimony than pure argument. I raised during the hearing whether the motion to dismiss needed to be transformed into a motion for summary judgment, but parties clarified that the allegations in the charge were the only facts to be considered in the motion to dismiss. In this recommendation I have not relied on any factual information, other than the allegations of Beaupin's Complaint(s) and information gleaned from the MCAD submissions.

**II.     Analysis**

It is well-settled that, "in a Title VII case, a plaintiff's unexcused failure to exhaust administrative remedies effectively bars the courthouse door." *Jorge v. Rumsfeld*, 404 F.3d 556, 564 (1st Cir. 2005). Specifically, "an employee alleging discrimination must file an administrative claim with the EEOC or with a parallel state agency before a civil action may be brought." *Thornton v. United Parcel Serv., Inc.*, 587 F.3d 27, 31 (1st Cir. 2009). "When filed with a state agency, the administrative claim must be filed within 300 days after the alleged unlawful employment practice occurred." *Id.* Additionally, because the primary purpose of filing an administrative claim is to "give[] notice to both the employer and the agency of an alleged violation and [to] afford[] an opportunity to swiftly and informally take any corrective action necessary to reconcile the violation," the "scope of the civil complaint is . . . limited by the charge filed with the EEOC and the investigation which can reasonably be expected to grow out of that charge." *Id.* (quoting *Powers v. Grinnell Corp.*, 915 F.2d 34, 38 (1st Cir. 1990)).

As noted above, Defendant argues that Beaupin failed to exhaust his administrative remedies. *See* Docket No. 20, at 6–10. Specifically, Defendant contends that (1) Beaupin's charge was untimely, and (2) Beaupin raises entirely different claims in this lawsuit than he raised in the MCAD/EEOC charge. I agree with Defendant and recommend that the District Judge grant Defendant's motion to dismiss Beaupin's claims.

    *A.     Timeliness of Beaupin's MCAD/EEOC Charge*

To bring a civil action under Title VII, "an employee must first file a 'charge' with either: (1) the [EEOC] within 180 days of the alleged unlawful employment practice; or (2) a parallel state agency—in this case, MCAD—within 300 days of said practice." *Aly v. Mohegan Council, Boy Scouts of Am.*, 711 F.3d 34, 41 (1st Cir. 2013). Here, Beaupin filed his charge with MCAD and the EEOC on March 2, 2020, which is 959 days after the allegedly unlawful employment

practice (the July 17, 2017, termination) occurred. Docket No. 20-2, at 1, 2. Accordingly, Beaupin's filing of the charge was untimely.[14]

In his opposition to Defendant's motion to dismiss, Beaupin appears to concede that he missed the 300-day filing deadline. He argues, instead, that the Court should apply equitable tolling, including what he refers to as "union grievance tolling." *See* Docket No. 23, at 2. Specifically, Beaupin contends that he "diligently pursued remedies," both internally and through his union's arbitration procedure, and that this justifies tolling. *Id.* According to Beaupin, a "Massachusetts regulation tolls the Chapter 151B deadline during grievance processes" and, as a result, the same should apply to Title VII claims. *Id*. Unfortunately for Beaupin, neither equitable tolling nor "union grievance tolling" can save his claims from dismissal.

"The equitable tolling doctrine extends statutory deadlines in extraordinary circumstances for parties who were prevented from complying with them through no fault or lack of diligence of their own." *Neves v. Holder*, 613 F.3d 30, 36 (1st Cir. 2010). "[A] litigant is entitled to equitable tolling of a statute of limitations only if the litigant establishes two elements: '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and

---

[14] The mere fact that the EEOC issued Beaupin a right to sue letter does not mean that the EEOC found Beaupin's charge timely. *See Harvey v. Brigham & Women's Hosp., Inc.*, No. 24-CV-10652-ADB, 2025 WL 317545, at *5 n.7 (D. Mass. Jan. 28, 2025) (noting that "the fact that the EEOC issued a right to sue letter [is not] dispositive" as to timeliness); *Jahour v. Mass. Bay Transp. Auth.*, No. 23-CV-10993-AK, 2024 WL 519562, at *4 (D. Mass. Feb. 9, 2024) ("The Court considered that the EEOC did not dismiss [the plaintiff's] recent complaint for untimeliness, and instead issued a right to sue letter. In doing so, the Court contemplated its role in evaluating the EEOC's decision and whether it should base its own decision concerning timeliness on the EEOC's administrative outcome. . . . The Court in *Poirer v. Mass. Dep't of Corr*., examined this very question, and unequivocally declared that the court is empowered to arrive at its own finding, separate from the EEOC as to timeliness[.]"), appeal dismissed, No. 24-1243, 2024 WL 4110905 (1st Cir. July 8, 2024); *Slaman v. GSS, Inc*., No. 97-10331-MEL, 1998 WL 307472, at *1 (D. Mass. Feb. 5, 1998) (explaining that the EEOC's right to sue notice "operates as a reminder that suit must be brought within ninety days, but does not in any way dispense with the requirement that a claimant have filed a timely charge in order to bring suit").

prevented timely filing.'" *Menominee Tribe of Wis. v. United States*, 577 U.S. 250, 255 (2016) (quoting *Holland v. Florida*, 560 U.S. 631, 649 (2010)); *see Bonilla v. Muebles J.J. Alvarez, Inc.*, 194 F.3d 275, 279 (1st Cir. 1999) ("[E]quitable tolling is not appropriate unless a claimant misses a filing deadline because of circumstances effectively beyond her control (such as when her employer actively misleads her, and she relies on that misconduct to her detriment)."). Although "Title VII time limits are not jurisdictional and may be subject to equitable tolling," *Farris v. Shineki*, 660 F.3d 557, 563 (1st Cir. 2011), "the First Circuit has held that courts should take a narrow approach to granting equitable exceptions in discrimination cases," *Rodriguez v. Putnam Invs.*, No. 06-10819-MLW, 2007 WL 9798216, at *3 (D. Mass. Sept. 15, 2007); *see Bonilla*, 194 F.3d at 278 ("[T]he baseline rule is that time limitations are important in discrimination cases, and that federal courts therefore should employ equitable tolling sparingly."); *Chico-Velez v. Roche Prods., Inc.*, 139 F.3d 56, 58–59 (1st Cir. 1998) ("Federal courts should not apply equitable tolling liberally to extend time limitations in discrimination cases.").

In a sense, Beaupin has been assiduous in pursuing his rights. He took advantage of his union's grievance process, initiated arbitration proceedings, filed an administrative claim with MCAD and the EEOC, and filed suit in this Court within the ninety-day window following his receipt of a right to sue letter from the EEOC. However, Beaupin has not pointed to—nor have I identified—"extraordinary circumstance[s]" that prevented him from timely filing his MCAD/EEOC charge. *Menominee Tribe of Wis.*, 577 U.S. at 255.

Beaupin's oral argument emphasized the substantial amount of time it took for MCAD to resolve Beaupin's complaint to that agency. But such delays do not amount to "extraordinary circumstances" for purposes of tolling the limitations period. In *Daughtry v. King's Department Stores, Inc.*, the First Circuit rejected the plaintiff's argument that the court should apply equitable

14

tolling because of "MCAD's six-year delay." 608 F.2d 906, 909 (1st Cir. 1979). The First Circuit reasoned that, irrespective of the delay, "[t]here [was] no evidence . . . that MCAD [or] EEOC . . . in any way caused plaintiff not to file within the 300-day period." *Id*.; *cf. Harrington v. Lesley Univ.*, 554 F. Supp. 3d 211, 227 n.8 (D. Mass. 2021) (concluding that this case was "not the sort of exceptional case for which the equitable tolling doctrine is reserved," where the plaintiff claimed that "she diligently pursued her rights because she filed a formal complaint with the Title IX coordinator . . . and then waited to file suit with the MCAD while the Title IX findings were pending for two years"). The same logic controls here. Nothing prevented Beaupin from proceeding on a separate track; he could have brought the charges to MCAD or the EEOC before the 300-day period ended, and MCAD's delay did not prevent him from doing so.

Beaupin's opposition to Defendant's motion to dismiss also makes reference to "union grievance tolling." The suggestion is that this Court should adopt a variant of the rationale employed by MCAD when it concluded that the statute of limitations for filing an MCAD complaint had been tolled during the pendency of the grievance process.[15] *See* Docket No. 23, at 4.

---

[15] As noted above, MCAD considered the merits of Beaupin's charge even though it was filed many more than 300 days after his termination. *See* Docket No. 20-3, at 4–5. MCAD acknowledged that, at the time it reached its decision (in May 2024), the applicable regulation provided that an administrative charge is untimely if not filed within 300 days of the allegedly unlawful employment practice. *Id.* at 4. However, MCAD announced that it would apply the regulation that governed at the time of Beaupin's termination (in July 2017). In MCAD's words, this regulatory change, which it characterized as the first change "in over 20 years," would have a "substantive impact and require dismissal of [Beaupin's] case without investigation." *Id.* at 4–5. In light of Beaupin's pro se status, MCAD completed the investigation and reached his claims on the merits. *See id.* Current MCAD regulation states "[a] complaint shall be filed within 300 days after the alleged unlawful conduct." 804 Mass. Code Regs. 1.04 (2020). But the governing MCAD regulation in 2017 stated that "the six month requirement shall not be a bar to filing in those instances . . . when . . . an aggrieved person enters into grievance proceedings concerning the alleged discriminatory act(s) within six months of the conduct complained of and subsequently files a complaint within six months of the outcome of such proceeding(s)." 859 Mass. Reg 109 (Dec. 25, 1998).

Beaupin's argument bears no fruit. Controlling case law makes clear that "the pendency of a grievance, or some other method of collateral review of an employment decision, does not toll the running of the limitations periods." *Del. State Coll. v. Ricks*, 449 U.S. 250, 261 (1980); *see also Int'l Union of Elec. Workers v. Robbins & Myers, Inc.*, 429 U.S. 229, 236–37 (1976) (holding that the statute of limitations under Title VII is not tolled by a collective-bargaining grievance procedure).

### B.     *Beaupin's Charge Raises Different Claims from Those Raised in His Lawsuit*

Even if Beaupin's MCAD charge had been timely, his claims are still subject to dismissal, as the claims raised in the present lawsuit (*i.e.*, retaliation) are factually distinct from those raised before MCAD and the EEOC (*i.e.*, discrimination).

It is well established that "[a] Title VII suit may extend as far as, but not beyond, the parameters of the underlying administrative charge." *Jorge*, 404 F.3d at 565 (citing *Fine v. GAF Chem. Corp.,* 995 F.2d 576, 578 (5th Cir. 1993)). While "the scope of a civil action is not determined by the specific language of the charge filed with the agency," it "may encompass acts of discrimination which the [agency's] investigation could reasonably be expected to uncover." *Davis v. Lucent Tech., Inc.*, 251 F.3d 227, 233 (1st Cir. 2001) (quoting *Conroy v. Boston Edison Co.*, 758 F. Supp. 54, 58 (D. Mass. 1991)); *see Powers v. Grinnell Corp.*, 915 F.2d 34, 39 n.4 (1st Cir. 1990) ("[I]t is not the scope of the actual investigation pursued that determines what complaint may be filed, but what [agency] investigation could reasonably be expected to grow from the original complaint." (quoting *Schnellbaecher v. Baskin Clothing Co.*, 887 F.2d 124, 128 (7th Cir. 1989))). In determining what the agency's "investigation could reasonably be expected to uncover," *id.*, "[i]t cannot be assumed that [an agency] investigation[] [is] designed as [a] fishing expedition[] to uncover all possible transgressions, especially if not alleged." *Patoski v. Jackson*, 477 F. Supp. 2d 361, 364 (D. Mass. 2007). "[T]he agency must be informed of the claim in the

16

complaint[,] or during the period of investigation." *Moorer v. Dep't of Social Servs.*, No. 08–11584, 2010 WL 3258609, at *9 (D. Mass. Jan. 25, 2010) (second alteration in original) (quoting *Ianetta v. Putnam Invs., Inc.*, 142 F. Supp. 2d 131, 134 (D. Mass. 2002)).

The charge that Beaupin filed with the administrative agencies (MCAD and the EEOC) alleged—in no uncertain terms—that Defendant had discriminated against him on the basis of "Ancestry, Race, and Color" in violation of Chapter 151B and Title VII. Docket No. 20-2, at 1. In that charge, Beaupin explicitly asserted that, although he consistently felt that he had not violated the protected patient policy and, therefore, that his "termination was unfair and unjust," he initially "did not . . . suspect any discriminatory animus." *Id*. Indeed, Beaupin claimed to MCAD that it was only after he had the opportunity to review various documents obtained through the arbitration process that Beaupin came to believe that "discriminatory animus had been involved in [his] termination." *Id.* In particular, Beaupin noted that several nurses had provided statements during the investigation into the June 2017 incident described above, in which they described Beaupin as speaking Haitian Creole with the visitor. *Id.* On this basis, Beaupin contended that he "was terminated because [he is] Black of Haitian ancestry." *Id.*

Although Beaupin's claims before this Court make passing reference to discrimination, he plainly alleges that his "termination was an act of retaliation." Docket No. 1, at 6. Specifically, Beaupin claims that such retaliation was in response to his complaints in *May* 2017, in which he complained explicitly about racially-biased unfairness in casting blame for the May 2017 Hugs incident. Docket No. 1, at 6. Beaupin claims that, following the May 2017 incident, he was singled out and berated for violating the Hugs policy, despite the fact that "[s]everal officers, all white males and females, openly stated that they were unaware of the Hugs policy." *See* Docket No. 16, at 2. Beaupin alleges that on the day after the incident he reported to Supervisor Khirullah and

Director Gibbons that he "was being harassed, discriminated against, and unfairly targeted." *Id.* at 3. Such a report of discrimination would indeed constitute a protected act, for which retaliation would be illegal. Beaupin alleges that, approximately one month after "enter[ing] into a protected act" of reporting the alleged discrimination, he "found [himself] under investigation for [a] policy violation" and was subsequently terminated. *Id.*

MCAD's investigation could not reasonably have been expected to address or uncover Beaupin's allegations about retaliation for complaining about racial bias in response to the Hugs incident. Nothing in the MCAD charge even mentions Beaupin's current allegation that he complained about discrimination prior to his termination, let alone that he was terminated in retaliation for doing so. On the contrary, the MCAD charge asserts that Beaupin did not even come to believe that he had been discriminated against until *after* he had been terminated and had participated in the arbitration process. *See* Docket No. 20-2, at 1 ("While I felt that this termination was unfair and unjust, I did not suspect any discriminatory animus at this time. . . . While reading over the documents pertaining to the grievance claim, I felt as if a discriminatory animus had been involved in my termination.").

In short, the MCAD charge is not merely silent about the contention that Beaupin complained about being singled-out for blame regarding the May 2017 incident, it expressly *disclaims* any contention that Beaupin believed at the time of his termination that he had been discriminated against. Still less can the MCAD charge be interpreted to encompass Beaupin's present allegation, *i.e.* that Beaupin believed at the time that he had been discriminated against and that he had complained about such discrimination (and faced retaliation for making such a complaint). Put simply, the MCAD charge did not allege retaliation. Rather, the MCAD charge stated that Beaupin was "terminated because [he is] Black and of Haitian ancestry." Docket No.

18

20-2, at 1. As such, MCAD would have had no occasion to investigate whether Beaupin was terminated in retaliation for complaining, a month earlier, about racial bias in being unfairly singled-out for criticism following the May 2017 Hugs incident.

To be sure, Beaupin's second amended complaint refers, generally, to "discrimination" as well as retaliation. Docket No. 16, at 4. But assessment of a motion to dismiss must be based upon the well-pleaded factual allegations of the complaint, not upon conclusory legal generalizations. *See Morales-Cruz v. Univ. of Puerto Rico*, 676 F.3d 220 (1st Cir. 2012) (specifying that "conclusory legal allegations . . . need not be credited"). Merely adding the word "discrimination" to his complaint does not change the fact that Beaupin's complaint describes an entirely different factual scenario than his MCAD charge. In this Court, Beaupin alleges that he was unfairly singled out for criticism following the *May* 2017 Hugs incident, that he felt this was racially biased, that he complained about it the next day, and that he subsequently was retaliated against for speaking up about the racial bias he experienced. Before MCAD, in contrast, Beaupin alleged that the investigation into the *June* 2017 incident was infected with racial or ethnic bias, but that he only recognized this bias much later, after seeing documents in connection with his union grievance.

In short, Beaupin's current allegations do not fall within the ambit of the MCAD charge. Nor can he demonstrate that MCAD was reasonably likely to discover Beaupin's claim of retaliation during its investigation. Accordingly, Beaupin's claims must be dismissed for failure to exhaust administrative remedies. *See, e.g.*, *Agaj v. Boston College*, No. 24-cv-10884-JEK, 2024 WL 4754380, at *4 (D. Mass. Nov. 12, 2024) (dismissing for failure to exhaust administrative remedies the plaintiff's claim of *retaliation* on the basis of religion where the plaintiff had alleged religious discrimination to MCAD); *Posada v. ACP Facility Servs., Inc.*, 389 F. Supp. 3d 149,

158–59 (D. Mass. 2019) (dismissing for failure to exhaust remedies the plaintiff's claim of *race* discrimination where she had alleged *sex* discrimination to MCAD/EEOC).

## CONCLUSION

For the foregoing reasons, I **RECOMMEND** that the District Judge **GRANT** Defendant's motion to dismiss (Docket No. 19).

Dated: June 5, 2025

/s/ Paul G. Levenson
Paul G. Levenson
U.S. MAGISTRATE JUDGE

## NOTICE OF OBJECTION PROCEDURE

The parties are advised that under the provisions of Federal Rule of Civil Procedure 72(b), any party who objects to this recommendation must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. *See Keating v. Sec'y of Health & Hum. Servs.*, 848 F.2d 271 (1st Cir. 1988); *United States v. Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378–79 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980); *see also Thomas v. Arn*, 474 U.S. 140 (1985).